Good morning, Your Honor. It's Todd Burns on behalf of Mr. Vescuso. My hope is to save at least three minutes for rebuttal. All right. Please note that the time shown on the clock is your total remaining time. Thank you, Your Honor. The linchpin of the government's case against Mr. Vescuso was the testimony of its cooperating witness, Cecil Garr. A key component of the defense was to undermine the good faith of the government's investigation and case and the reliability of Mr. Garr by introducing audio-video recordings showing the investigating agents repeatedly telling Mr. Garr that he needed to pin the blame on Mr. Vescuso. For example, at the first meeting between the agents and Mr. Garr, which was audio-video recorded, they said to him, if I were you, I'd do whatever it takes to pin the blame on Vescuso and help myself out. At another point, they said, if you don't help us pin him, the cold hard fact is we have two suspects in this investigation. You're one of them. At another point, they said, there's a whole series of charges that's going to be dished out. You're going to share those charges with Vescuso. The more you help out, the more maybe those charges could shift to him. At another point, they said, if you don't want to participate and you don't want to help us, then you will also become a target of the NCIS. There were many, many statements like this made in July 2014, months before Mr. Garr's arrest by the agents to Mr. Garr, and on October 22, 2014, the day that Mr. Garr was arrested. But it wasn't just these statements pressuring him to pin the blame. The agents set out the story that they believed Mr. Garr should tell, which in a nutshell was that there was all this material piled up on his lot. He needed to get the lot cleaned up. Mr. Vescuso showed up and said, oh, I'll buy this stuff from you and take it off your hands. It was all Mr. Vescuso's idea. It was all Mr. Vescuso's idea to put the dumpsters on the lot later on, and that Mr. Garr didn't make much money from it. So counsel, wasn't Mr. Garr thoroughly impeached at the trial? No. Why not? He might not have been impeached in the exact manner that counsel wanted the impeachment to proceed, but there was substantial impeachment of Mr. Garr, wasn't there? Well, particularly focusing right now on what I just talked about, the pin the blame, shift responsibility, those sorts of things. As an initial matter, the progression of the agents feeding Mr. Garr the story, none of that ever came in because I wasn't able to play the audio-video recording. You could ask him. Or able to play the recording. I'm sorry, you did ask him, if I have this right, a question, and what they told you is they wanted you to give them a name, and if you didn't give them a name, they weren't going to be able to help you, right? And he answered, arguably falsely, look, what they told me is they were going to, they were trying to, they were going to allow me to help myself. So you needed the tapes because he's denying, in effect, the very critical question that was put to him. Absolutely. And what you can see in the record is that early on in the cross-examination of ER 572 and 573, when I'm allowed to play the first of those clips that I prepared to use, he's shut down when he tries to say to me that this isn't going on because I get to play them saying, you know, we believe someone was trying to manipulate you, that someone was viscuso. He responds, I don't know who you want me to rat out. And then the agents say to him, we're losing our ability to help you. But the judge cut it off right after the rat out thing. He said, stop it, stop it, stop it. And that's the only time I got to play a recording, and you can tell that because the transcript says recording played. A few other times I played the recording to refresh his recollection with headphones on. The jury didn't get to see any of that. But what's interesting is that I believe- Would those videos be hearsay? No, absolutely not. Why not? I wasn't introducing them to show the truth of anything that the agents were asserting. I was using them to show that the agents were pressuring Gar and feeding him the story that they wanted him to tell, which eventually he did tell. That was his trial testimony in a nutshell, what I just gave to you, the story that they fed to him. And what's interesting, and I think it's because Gar could tell that I couldn't introduce these tapes, he'd seen me be shut down, and so he started playing games with me. And he started saying things like, I don't think they wanted me to name him specifically. My impression is that they wanted me to admit my involvement in the crime itself. And that's at ER 2574, right after I had played the rat- you know, who do you want me to rat out clip. He realizes the clip stopped, he realized I can't do anything, and he keeps doing that sort of stuff throughout his trial. Tell me exactly what the purpose was for playing the tapes. Was it to show Gar's motives to lie? What was the purpose of playing the tapes? If the question was already asked, what was the motive for playing the videos? Well, there were two major reasons for playing the tapes, which I've separated them in my briefs. One was to show that they pressured Gar to pin the blame on Viscuso, help himself financially, get a lower sentence, and that sort of thing. And then the other clips were focused on inconsistent statements that Gar made between those interrogations and at trial. So the reason for the former-I'm sorry, Your Honor. No, go ahead. The reason for the former was, again, to show that Gar had been pressured to make these statements, had been fed these statements, and had been told that if he did this, he would get a payoff. But if you were able to ask him those questions, then the videos were extraneous to being able to ask those questions. But I was almost completely prohibited from asking those questions. And when Gar realized I could not make him pay for his lies and his dissembling, he dissembled further. And you can see that throughout the cross, including at ER 2582, 583. He repeatedly tries to deny that they had pressured him or he was affected. And the prosecutor picked up on this, too, because in the redirect, she got up and she said to Mr. Gar, did you believe the agents wanted you to shift the blame to the defendant? Gar answered no. Those tapes would have blown that out of the water. If I could have played those recordings, it would have absolutely blown that claim out of the water. I got up and said. But let's look at it, because it looks like the district court ruled that the statements of the agents were hearsay. And we give an abusive discretion standard on whether he was incorrect on that. I know you argue differently. You argued at the time differently. It wasn't just on your appeal. You said at the time, Judge, I'm not offering these for their truth. I'm offering them for the reasons you just mentioned. And the judge, nevertheless, in ways that, frankly, I don't understand, said they were hearsay. And I didn't understand. If I could just finish. Sorry. So I know that there's a disagreement about that. But he did allow, the court allowed you at least once to play the clip of the video for the jury that contradicted Gar's in-court testimony. Do you agree with that? He did. All right. It seems like. And then he cut it off in the middle before I got to the main point. It seems like the complaint that you have stems from, you were the attorney down below? Yes. Your misunderstanding of the scope of the district court's ruling on your ability to use the video to impeach Gar, because from the record, it appears that the district court allowed you to use the video to impeach Gar about his own statements, but would not allow you, and I just want to make sure we're on the same page on this, but would not allow you to use the video to introduce statements made by the agents. Is that correct? The court wouldn't allow me to use the video, period, other than after I played that first clip. Well, I know that's how you interpreted that, that it was precluding the use of all video. But it looks like you filed a notice after Gar's testimony where you recognized that you may have pulled back from seeking to admit many of the statements reflected. This is at ER 243. You pulled back from seeking to admit many of the statements reflected in the audio-video recording based on the court's rulings, and that you realize, however, that you may have misgaged the intended breadth of the court's rulings. That's right. I was, frankly, dumbfounded by the rulings because it seemed obvious to me I was not seeking. Well, but dumbfounded versus misgaged the breadth of the court's rulings. But I couldn't understand why statements from the agents pressuring Mr. Gar to pin the blame on Mr. Viscuso could be construed as anything as being introduced for the effect on the hearer, which is what I said to the court. You haven't identified, at least in your briefing, any specific portion of the video of Gar's statements that you were precluded from introducing. Well, I lodged the video with the excerpts, the video, which I had lodged with this court, and the excerpts with the court. And every time that I attempted to say to Gar, didn't the agent say to you nearly every time I was met with a sustained hearsay objection, including after the prosecutor did what she did on the redirect of having Gar say, no, I don't believe they wanted me to shift the blame, I got up then and tried to clarify it again. That's the truth of the matter, whether or not they wanted him to shift the blame. That's the truth of the matter. That was her question. She asked him, did you believe the agents wanted you to shift the blame, which really is the effect on him, what he believed based on the effect of him. But that was her question. I got up and said, the agents, in fact, repeatedly told you to shift the blame and you would bear less responsibility. And a hearsay objection was sustained. So do you argue that you were able to impeach him regarding his plea deal? No. Yes, I argue that I was not able to effectively impeach him. Why not? I mean, a lot of aspects of the plea deal, the critical core aspects that normally come out in a plea deal came out. Well, one of the important things that I wasn't able to get were the front-end benefits, which is that he effectively got a four-point reduction, a reduction from $555,000 in loss to $200,000, and that affected his guideline range and it affected his restitution amount. That is something they gave him in the initial agreement. They offered an agreement with higher guidelines and higher restitution. He wouldn't take it. They offered an agreement where he had to cooperate with lower guidelines and lower restitution. That came out, though, what he was getting for his plea came out. Solely the restitution point, not the guidelines point. And the judge said I couldn't get into anything about guidelines. Sentencing was for the court. And then the restitution point, the government got up in its rebuttal closing and said that I had misled the jury on that point, when I didn't mislead the jury on that point at all. GAR should have been on the hook for at least $555,000 in restitution. You were able to get out before the jury that he got a lower amount in exchange for testifying? I was able to get out that he got a lower amount of restitution. Your point is that under the guidelines, the significance of the loss amount is not so much for restitution, but it tremendously affects the offense level. And that by reducing the amount of loss through the change in restitution, they were giving him much less exposure in return for the testimony that he now was giving. And that was never able to be brought to the attention of the jury in any way, shape, or form. Do I have that right? That is absolutely correct. But the fact that he got benefits for his testimony was brought to the jury. So the extent to which the benefits were described may be a point of contention. But the jury knew that he had been benefited by testifying in favor of the government. But it did come out that he got a lower restitution amount and a lower guidelines adjustment. That is correct. That's not the guidelines. The restitution point came out. He admitted to that. The judge wouldn't let me get into the guidelines. Isn't it in R196 that he got out both? I may be wrong, but I had written that down. No, I believe I just was allowed to get in the restitution. The judge said no guidelines. That sentencing is for the court. But I will, Judge Rawlinson, you're correct, that to some, unlike the pin the blame stuff, where to the extent I got anything, GAR took it back, the government took it back, and I wasn't able to present that major component to the jury, which undermined the good faith of the government's case. I was able to get out some stuff about the benefits to GAR. But I wasn't able to get out that they effectively gave him this front-end guidelines benefit before he even testified. And then what they were offering him, I wasn't able to effectively get out what they were offering him on the back side because I wasn't able to explain the guidelines to them. I wasn't able to explain the plea agreement to them. That was all shut down. That's not a matter for the jury to take into consideration what the sentence will be. The jury is not to be influenced by what the potential sentence is. Your point is that's not for the jury to decide. That's for the judge to decide. So why did the judge err by reserving those matters to the court? Well, and I think it's in this court's en banc opinion in Larson, which is a 2007 case, I don't have the opinion handy, that makes clear that if there is tension between not revealing that sentencing is for the jury and the defendant's confrontation rights, that tension has to yield to the defendant's confrontation rights. And here I was just trying to make clear to the jury what benefit GAR was going to receive, had already received and stood to receive in the future, not to say anything about Mr. Viscuso's sentencing, but if there were any impact on Mr. Viscuso's sentencing, that could easily be addressed with the limiting instruction, which the judge gave anyway. I don't know of any case, correct me if I'm wrong, that says it's not totally proper to bring out what sentencing benefit a cooperator is going to get for his cooperation. That is for the jury because it totally goes to the motive of the cooperator to lie. And I think that's absolutely right, and I cited Schoenberg, I cited Phillips. Again, the Larson case, I think, makes that point. I mean, if we can't, you know, Larson talks about not just giving the jury an idea of what the person stands to gain, but the magnitude, that the jury should be apprised of the magnitude of what this is. But do you have a case where the actual guideline calculations were given to the jury? I don't off the top of my head. I can look for one in Submitter 28J. I think that would be very unusual for the jury to be apprised of how the actual guidelines work, what the calculations are, what the downward departures are. That just isn't normally given to the jury. Well, but for example here, let's take an obvious example. Mr. Garr should have been hit with an abuse of trust guideline adjustment. It would happen in any case. Now, how am I going to explain that to the jury without having some reference or some explanation of the guidelines? It's impossible. Perhaps that's why the judge said that it was not appropriate to go into that because it could confuse the jury in terms of what the jury is supposed to be deciding. But I think I need to explain to them what it is that he has been, how he has benefited and how he stands to benefit. But I want to step back from all this because, you know, I started off my argument on the point of the pressuring him to pin the blame, pressuring Garr to pin the blame and feeding him a story which he told. That's separate from all this stuff. That's separate from the guidelines benefits. That's separate from the prior inconsistent statements. That's separate from the fact that the judge precluded that Garr lied to the pretrial services officer in this very case in an effort to get out on bond. That is, as Kyle's versus Whitley Supreme Court case had characterized, that is evidence that would undermine the good faith of the government's case in an investigation and blow it out of the water. And if you haven't watched the video, I beseech you to watch the video of this questioning because it is disturbing. I've never seen anything like it. Agents telling someone to pin the blame and not only doing it, which I think shocks the conscience, but doing it with the, with the video audio video camera rolling. I mean, I think that that gives that, that that would support a colorful motion to dismiss based on a due process violation. And if that's so certainly the jury should be apprised of that. Are you saying that the only evidence against your client was Mr. Gar's testimony? No, it was the key evidence though, because all the other evidence in the case made it apparent, you know, he's going on, he's driving a dump truck under, under base where he's confronted by armed Marines. He's giving them his ID. He's giving them his truck registration. He's being checked when he leaves the base. He's going, when he goes to places on base, he's getting a visitor's badge. He's doing everything above board. And when he's first questioned about it by Sylvia O'Brien. It's selling the metal above board, the brass casings. Was that above board? Absolutely. Nick Jonas of Pomona scrap metal testified that it appeared to him that everything was above board and that he had a similar arrangement with the person who was getting metal from March air force base. He said he is trained and they have policies to alert them when maybe the metal is stolen, because that kind of thing happens. And he thought everything was completely above board. The jury heard all of that? Sure. The jury didn't hear about this pressure to shift the blame and that the agents fed him a story from the outset. All right. Counsel, you've well exceeded your time. We'll give you a couple of minutes for a rebuttal. Thank you. May it please the court, Daniel Zip on behalf of the United States. You're trial counsel? I was not, Your Honor. But I'm familiar with the record. I want to start with the issue about the cross-examination with the plea agreement. First, just to clarify the record, the defense counsel was not prohibited from inquiring as to the effect of the plea agreement on the loss amount in this case. If you look at ER 599, he specifically asked the defendant, you realize that under this plea agreement, the government agreed to recommend a portion of the guidelines that go up based on the amount of loss, that they would recommend a lower amount of loss than actually happened, right? He says that's what I see on the paper. And then the defense counsel continues, and previously you had another plea offer that recommended a higher amount, and the defendant says he didn't remember. In addition, prior to that, the prosecutor herself, in direct examination, asked him what his understanding of the plea agreement was with respect to the loss amount, and he indicated that he understood that it went from $550,000 down to $200,000. But the significance of that is in the reduction in the prison time through the reduction in the guidelines, whereas all the jury is hearing is about the money aspect of it. And my understanding from your adversary, he says when he tried to get into the real significance of it, which is a great big benefit on prison time, he was precluded. And he was precluded on the erroneous, in my view, reason that this punishment is not a concern of the jury. This had nothing to do with punishment of the defendant. This had to do with the benefits given to your cooperator. I don't think that's accurate, Your Honor. Which part? The fact that he was precluded from talking about the benefits. I think if he asked about the loss amount, the United States had previously established. I'm trying to say that the loss amount by itself means nothing to the jury in the same way that its effect under the guidelines on offense level means. One's money, one's liberty, you don't have to be much of a human being to think that prison time is of more concern than money. You say he wasn't precluded. What was he allowed to then ask about? So he asked about the specific loss amount. The defendant acknowledged that that's what the plea agreement said. And the prosecutor, to go to your point, Your Honor, had previously didn't just say the loss amount as to restitution. She specifically tied it to its effect on the sentencing range. What the defendant was precluded, if you read the entirety of the exchange, after discussing the loss amount and the restitution, he then moved on to these other guidelines adjustments. And that's where the court started cutting him off. And the reason the court did that is because it created what he argued was an obvious inference that this was a benefit the defendant had received. But the facts prior to the plea negotiation shows that both defendants, from the very beginning, got the same plea offer that didn't include obstruction and didn't include abuse of trust, that those benefits, although it would create an inference that maybe those were tied to cooperation, both defendants received the same benefits from the very beginning. So what the court was doing was say, don't present this false inference to the jury that he somehow got a benefit that he didn't. Well, didn't the judge also preclude the defense's sentencing expert, who would have simply brought out the fact that the plea reduced the maximum from 10 years to 5 years, a very substantial benefit. Why wasn't that errored? Your Honor, for the same reason. Both defendants, before any cooperation, before anything, the very first plea agreement had already eliminated that statutory maximum, had already eliminated those guidelines. So we're talking about the benefits given to the co-operator gets a 5-year benefit in terms of max. Huge benefit. He's asked about it, and he, in my suggestion, lies, Gar, that is, the co-operator, and says, while he hoped to receive a lower sentence, he did not expect to be at all, whereas the plea agreement guaranteed, guaranteed, that the most he could get was 5 years.  But, Your Honor, what the court held before trial was that limitation from 10 to 5 had absolutely nothing to do with the cooperation. And how can that be? Because that was the very first plea offer that went to both the defendant and the co-operator. But he knows, the defense argument was that Gar knows that if he cultivates, if he goes along with the government, he will get a reward in terms of this reduction. I understand it was before he gave the cooperation, but that doesn't mean it wasn't a benefit that he, that it impacted how he was going to testify. How could the jury not know about this great benefit that he received from the government, who now is asking him to nail the defendant? Your Honor, all I can say is both the defendant, without any cooperation agreement, without anything, at the very beginning in February both defendants got the same benefits in the guidelines and in the mandatory minimum. And it would have been misleading to the jury to suggest that that first plea offer had anything to do with Gar's later cooperation. So what do you say, shifting gears for a minute, about the tapes, about the videotapes? Here we have agents, and I think defense counsel is not without cause in saying that their activity shocks the conscience. I must say I've never seen in my 23 years on the bench agents act the way these agents did. And there they are, and they're saying, more or less explicitly, you've got to nail Van Cusen, and we're not going to help you if you don't. And the judge says, oh, no, we're not going to allow that except for one limited part. We're certainly not going to allow what the agents say, because that's hearsay. It's not hearsay. It's being offered to explain why he knew he had to nail Van Cusen. Well, Your Honor, I guess my response would be on the hearsay issue, the only way that this would come in as an effect on the listener would not be the effect that it had on Mr. Gar at this interview, which was two full years before he testified. It's sort of an additional break that whatever these agents unsuccessfully tried to get him to cooperate at the early part of the interview, that that had an effect on his testimony years later after he'd entered into cooperation agreement with an attorney. Well, how do you say that when they're making plain to him that that's what you've, if you want to get the deal, you've got to nail Van Cusen. So you think he forgot it because two years passed? Well, he certainly didn't accept their offer to cooperate. At the time. Later on, he does. And when he does, and therefore, isn't it fair for defense counsel to say, well, what changed between then? He thought it over and he thought, gee, I can get a really great deal if I nail Van Cusen. I didn't want to do it maybe because it's not true. But now I realize I can get a great deal. And if the jury had understood that, they might have well concluded he was a liar. Well, Your Honor, I would say that if you look at the totality of the cross-examination on that first day, the court didn't completely eliminate the defense's ability to discuss or to introduce sections of this interview. What happened at the very beginning of cross-examination, defense counsel stood up, set up equipment, and started to press play on the video. And the court, after an objection, said, well, you have to ask him some questions first to see what he actually says before you can impeach him with this material. And then when the defendant denied saying that he had asked them about ratting someone out, they played one section for the jury. And then there were four or I think five other instances where the defendant either stated, I don't remember it that way. He was then privately allowed to watch the video. And then he testified, yes, they asked me, they were putting pressure on me, or they wanted me to pin it on Mr. Gar. After those four interview clips, defense counsel sort of moved on to other aspects of his cross-examination. As Your Honor noted, he hasn't pointed out any specific clips or, in addition to those four, that he tried to get in and was prevented from doing so. Instead, after a break over the course of the night, he filed a sort of notice to the court with 40-some-odd pages of transcripts and a request that the court rule which one of these he would have allowed in had he attempted to. But this was in the middle of cross-examination. He came back in the next morning. Certainly the form that he was allowed to get into this stuff was not what he wanted. But over the course of the night, he certainly could have come back in and continued asking questions. So are you saying that the extent the judge excluded him from bringing in the statements of the agents on the grounds that they were hearsay, you agree that that was erroneous, but you think it was harmless error? It certainly was harmless error. It's a difficult issue. Why is it a difficult issue? It seems to me, forgive me, my colleagues may very well disagree with me on this, but to me it's open and shut that it's not hearsay. To the extent it is for the effect on the listener, it would be sort of years later after a counseled cooperation agreement that that somehow affected his testimony in trial. It wouldn't be an abuse of discretion, at the very least for the court, to say that that is not sort of relevant enough to inquire in cross-examination. And if you look at the letter from the defense counsel, he even suggested after listing all the things he wanted to get in, that maybe it would be better to pursue this line of questioning with the agents and inquire with them what they were trying to do with Mr. Garr and to the extent that they didn't remember or had differing accounts of what their motivation was, to then introduce the clips through them. But it's not their motivation that's critical. It's Garr's motivation that's critical, and that's exactly why he wanted to introduce it while Garr was on the stand. And Garr testified on redirect that this was two years ago and he didn't remember the specific instances. Well, the jury was able to listen to Garr testify, gauge his credibility, and look at all the evidence. Could you address the prejudice prong? Yes, Your Honor. Did we agree that these were errors? Was Mr. Rescuso prejudiced? He was not, Your Honor, not in a way that would require reversal for two reasons. Even if the sort of nature that these videos were allowed in or the amount that that specific line of questioning was allowed in was improperly excluded, there was a wealth of other impeachment material that the defense counsel pursued against Mr. Garr. First of all, in the case in chief, every single witness that had interaction with Mr. Garr testified that he was untrustworthy, that he was lazy, that he needed supervision. Multiple people testified that he had a reputation for being untrustworthy. Then on cross-examination, the defense counsel got out the fact that Mr. Garr had lied to Lieutenant Colonel Pugliese, that he had lied to the initial investigator, O'Brien, that he lied to investigators at the first interview, that he lied to investigators at the second interview, including right after they had warned him that it was a federal offense for him not to tell the truth, that he lied about why he was fired, that he lied about Shane coming to pick up the scrap metal, and that he lied about the roll-offs. You don't disagree that in the end his testimony was critical to the government's conviction. You're just saying you feel he was adequately impeached because of these other things. No, Your Honor. He certainly was an important witness for the government, but there was substantial other circumstantial evidence of the defendant's guilt. As the district court held in the motion for a new trial, this was effectively a one-issue trial. No one was disagreeing that these two coordinated together to take scrap metal off of the base and sell it in return for $500,000. The only issue was whether Mr. Viscuso believed that Mr. Garr had the authorization from the Marines to sell him this money for cash and that that money was going back to the treasury. And why isn't then the centerpiece of that Mr. Garr? He was, like I said, he was important as far as— I thought you just told me the issue is whether he believed that Mr. Garr had authorization. And the person who is in the best position to offer evidence on that was Mr. Garr, which he did. Yes, Your Honor, but the other evidence, if you took Garr out of this trial altogether, what the jury would still hear is Mr. Viscuso arrived on the base pursuant to an actual government liquidator's contract that he signed as to how you're supposed to go through the bidding process to get this metal. That after that first pickup, that he then proceeded to pay cash, including from his own witnesses, cash that he took out of a liquor store ATM to pay Mr. Garr, that this continued for years, and then critically, that he knew that there was a contract in the process for doing it, and that when O'Brien called him, he told her he was with government liquidators. He told her he had a contract, and he told her he would fax it right over, but then never did, and then never returned her calls. And then there was the evidence of his post-arrest statement, that if you look throughout the sort of evolving story, that he starts by saying, again, I had an official contract with government liquidators. I picked up a couple loads with my dump truck. And then that story changes over the course of a couple hours, with him eventually admitting that he arranged for these roll-off dumpsters to come on, claiming at the outset that he had receipts for all this, but that they may have gotten wet in his glove box after the agents couldn't find them, claiming that he had reported us all on his taxes, and then changing his story and saying that, well, no, someone at the yard told me that I didn't have to pay taxes, and then ultimately at the end saying that he put it all together and realized that it was wrong, but had to pull it off or bring it off slowly. I'm sorry. So that sort of chain of circumstantial evidence, wholly independent of GAR, would have been sufficient to support conviction. Before you conclude, I'd like to ask you about the forfeiture order and whether our case in Honeycutt has any application to the forfeiture judgment. It seems like it does. I'm trying to figure out if the district court judge ever really had a fact-finding sort of hearing on determining whether or not he received all of the proceeds. I have to be honest. I'm not familiar with that case. Does it seem like he did? I'm just trying to see if the forfeiture order can hold up here. My understanding is that under Rule 32.2b, because he was only seeking a money judgment, the same procedural rules wouldn't apply, the same as if it were forfeiture of property, and that this court in Newman held that forfeiture serves an entirely different purpose than restitution, so the fact that he may not have kept the totality of that $550,000 doesn't affect the ability to forfeit it. Are you familiar with Honeycutt? I'm not, Your Honor. I apologize. Unless the court has any other questions. Thank you. Here's not. Thank you, counsel. Two minutes for rebuttal. Thank you, Your Honors. Regarding the strength of the circumstantial evidence, it was powerfully in Mr. Viscuso's favor. That's the whole reason the agents went to Mr. Garr and pressed him and pressed him to pin it on Mr. Viscuso, because without Mr. Garr's testimony, they couldn't get a conviction. I've tried several federal criminal cases. I've won a fair share. This was the strongest defense case I have ever had other than Mr. Garr's testimony. If I had been able to bring out just the part about the agents pressuring him, I am confident that it would have been a not guilty verdict. I went in confident of the case going in. The case was effectively shut down. The defense was shut down. Regarding the harmless error, you know, I did make a constitutional confrontation due process harmless error claim. The government did not counter it in its answering brief. That claim is waived. Regarding the guidelines amount, you know, to make the front-end benefit argument, I had to be able to bring out evidence as to what was in the initial February 2015 offer, the proposed plea agreement. I wasn't able to do that. And Garr was able to just shut down that line of questioning by saying I don't remember. I can't make that connection that they reduced his guidelines loss amount if I can't compare the one that he rejected from the one that he accepted. And regarding the idea that I was able to somehow get that out because there were questions about the guidelines loss, the questions were was the loss pegs your, you know, your guidelines amount. That was it. Nothing about the change in the two agreements because the judge wouldn't let me get into it. Regarding the both people getting the same, both defendants getting the same offer, it's simply not true. They got offers in February 2015, which they both rejected. Mr. Garr got then a cooperation offer in April 2015 that sweetened the pot, and he took that. Was that offer was not made to Mr. Viscuzzo, the second offer? That's correct. I thought the record was different. And I submitted, I moved to supplement the record, and I submitted an e-mail proposed offer from the prosecutor that came in November 2015, long after Mr. Garr was already cooperating, which had no cooperation agreement for Mr. Viscuzzo. Mr. Viscuzzo was already signed up, front-end paid, back-end offered. You mean Mr. Garr? I'm sorry. Mr. Garr was already signed up to cooperate, front-end paid, back-end offered. So they would have no motive to offer it to Van Cusum. That's correct. The reason they made it. But did they offer it, even if it was after the fact? Was it offered to Mr. Viscuzzo? It was not the same offer, number one. It was the same offer as far as loss, but without cooperation, yes. And what that reflects more than anything is their case against Mr. Viscuzzo was weak. Whereas their case against Mr. Garr was very strong. But if they made the same offer to both of them, why would it matter? Because the whole issue is the effect on Mr. Garr and what his incentives are. And his incentives, when he's negotiating that agreement, by the way, just a couple months after these conversations with the agents, not years later, he's negotiating that agreement with the agents, and he knows what he has to say. He knows what they want to hear to cooperate. He strikes a cooperation deal after rejecting the first deal. That was the only difference, though, was that he cooperated. But there would have been no need to cooperate if Mr. Viscuzzo had taken the deal as well. There wouldn't have been a trial. Well, that's true, except I suppose the fact that he's cooperating, that you know he's going to testify against you and implicate you as a motivator in getting you to the deal. He would still get cooperation credit. Sure, he'd done proper sessions. But if the deals were the same. But the deals weren't the same, and even if they were, the relevant thing for the jury is. Well, why weren't the deals the same? I mean, the only difference was that Mr. Garr was going to cooperate. Because, well, that's the big difference. Well, I know, but you said that everything else was the same. I mean, that they weren't the same, but that's the only difference. That's right. That's the critical difference. The offers are made months apart. They're made seven months apart. The first offer is made to Mr. Garr to get to sign him up as a cooperator, and the one that is made months later to Mr. Viscuzzo that just reduces the loss amount. But that has nothing. Counsel, we understand your argument. You've exceeded your time. Thank you. The case is argued and submitted for decision by the court.
judges: Rawlinson, Murguia, Rakoff